Max **KRUMHOLZ** and Emil Moosmann, Plaintiffs-Appellees,

v.

James Beckham **GOFF** and Mary Lois Goff, Defendants-Appellants.

Max **KRUMHOLZ** and Emil Moosmann, Plaintiffs-Appellants,

v.

F. T. **CANTRELL** and Mary Cantrell et al., Defendants-Appellees.

Nos. 14862, 14863.

United States Court of Appeals Sixth Circuit.

March 28, 1963.

Robert M. Coleman, Bowling Green, Ky., Coleman, Harlin & Orendorf, Bowling Green, Ky., Eugene H. Alvey, Louisville, Ky., on brief, for Max Krumholz and others.

Charles I. Dawson, Louisville, Ky., Earl S. Wilson, Louisville, Ky., on brief; Bullitt, Dawson & Tarrant, Louisville, Ky., of counsel for James Beckham Goff and others.

Joseph J. Leary, Frankfort, Ky., Robert M. Spragens, Lebanon, Ky., on brief; Smith, Reed & Leary, Frankfort, Ky., of counsel, for F. T. Cantrell and others.

Before CLIFFORD O'SULLIVAN, Circuit Judge, and ROBERT L. TAYLOR and RALPH M. FREEMAN, District Judges.

RALPH M. FREEMAN, District Judge.

These appeals (Nos. 14862 and 14863) are taken from judgments entered in two related diversity cases tried by the Court without a jury under a consent order of consolidation. The plaintiffs, Max Krumholz and Emil Moosmann, are appellees in No. 14862 and appellants in No. 14863. James Beckham Goff and Mary Lois Goff, his wife, are the defendants and appellants in No. 14862. Several individuals referred to throughout this litigation as the Cantrell group are defendants and appellees in No. 14863.

These cases were instituted to rescind the assignments of certain working interests in an oil and gas lease, known as the Leachman lease, in Green County, Kentucky, and to recover the sums paid and expenses incurred pursuant to the terms of the assignments. Defendants in both cases filed counterclaims for damages on the ground that the plaintiffs breached alleged implied obligations under the assignments (1) to operate the existing wells in a proper and workmanlike manner; and (2) to further develop the leasehold. The defendants, Goff and wife, are appealing from the judgment rescinding the sale of their $5/32$ working interest in the lease, while the plaintiffs, Krumholz and Moosmann, are appealing from the judgment dismissing their complaint for rescission of the $17/32$ working interest of the Cantrell group in said lease. The briefs raise no issue concerning the dismissal of the counterclaims.

Plaintiffs' actions for rescission arise from the following events. Activity in the oil fields of Green County, Kentucky, lured the plaintiffs, Krumholz, a certified public accountant, and Moosmann, a retired dairyman, both residents of New Jersey, to that County on January 1, 1959. On that same day, while at a restaurant in Greensburg, Green County, Kentucky, they were introduced by a farm boy to the defendant, James Beckham Goff, a former automobile salesman and dealer. After some conversation, Goff stated that he would sell his ⁵⁄₃₂ interest in the Leachman lease for a satisfactory price, quoting Krumholz a price of $500,000 for all working interests in the lease, and offered to contact the owners of the other interests if Krumholz was interested at that figure. Krumholz expressed an interest and asked that Goff immediately show Moosmann and him the leased property. Consequently, Goff drove the plaintiffs, Krumholz and Moosmann, to the property in his car. During this trip, in response to an inquiry of Krumholz about the oil production on the property, Goff either stated the lease *was producing* 600 barrels per day, according to Krumholz, or *could produce* 600 barrels per day if the weather was favorable and trucks were available, according to Goff. At this time, Krumholz and Moosmann saw the boundaries of the property involved.

Later the same day, or the next day, Goff introduced Krumholz and Moosmann to Mr. Cantrell and Judge Durrett, the principal members of the Cantrell group, at Judge Durrett's office in the courthouse at Greensburg, on which occasion, after some negotiations, it was agreed that the $500,000 figure quoted by Goff for the entire working interest in the lease was satisfactory if payable 40% in cash and 60% by reserving a share of the oil production. It was also agreed at that time that the Cantrell group would give Krumholz and Moosmann an option to purchase their ¹⁷⁄₃₂ working interest in the lease on the terms hereinafter set forth.

On January 2, 1959, pursuant to prior arrangement, Krumholz and Moosmann and their attorney, Eugene Alvey, met with Cantrell, Judge Durrett and other members of the Cantrell group and their attorney, Robert Spragens, and Goff and possibly others at Judge Durrett's office, and following further negotiations concerning option provisions, including the terms of a warranty clause, the Cantrell group, for a consideration of $5,312.50, executed and delivered to Krumholz and Moosmann an option to purchase until January 31, 1959, their ¹⁷⁄₃₂ interest in the lease for the sum of $106,250 cash, with credit for the amount paid for the option, and a reservation by the Cantrell group of ¹⁷⁄₆₄ of the oil produced on the lease after deducting the landlord's royalty until they had received a further consideration of $159,375, making a total consideration of $265,625 for the ¹⁷⁄₃₂ interest, being such prorata share of $500,000 for the entire working interest. The $5,312.50 payment for the option was a proportionate share of $10,000 offered by Krumholz for options on all interests consisting of the Cantrell group's ¹⁷⁄₃₂ interest, Goff's ⁵⁄₃₂ interest, and the remaining ¹⁰⁄₃₂ interest owned by some people named Dulworth.

The option contained a warranty clause as follows:

"7. First Parties represent and warrant that the daily production on this lease is approximately 400 barrels per day and Second Parties rely upon said warranty and representation in entering into this agreement."

This warranty provision was demanded by Krumholz, who initially suggested 600 barrels' daily production of oil as a result of his conversation with Goff the previous day, but finally accepted 400 barrels' daily production, as set forth in the option, after the Cantrell group declined to warrant either 600 barrels or 500 barrels daily, as suggested by Krumholz. Although Goff was present when the Cantrell option was being prepared, he denied any participation in the

preparation of the warranty clause or discussion as to the terms thereof, and there is no evidence to the contrary. Cantrell testified that Krumholz, on this occasion, stated that "he had to have some estimate there to take back with him to his group" and Alvey testified Krumholz said—"If it's any less than 400, I'm not interested."

The following day, January 3, 1959, Krumholz and Moosmann and their attorney, Alvey, met with Goff and the Dulworths and their attorney and accountant in Louisville. On this occasion, the Dulworths decided not to sell their interests because of tax consequences, but Goff executed and delivered to Krumholz and Moosmann for a consideration of $1,562.50 an option to purchase his 5/32 interest for $31,250 cash, with credit for the amount paid for the option, and the additional consideration of $46,875 to be paid from a 5/64 share of the oil produced on the leased property. Otherwise, the terms and provisions of the Goff option were identical with those in the Cantrell option, including the production warranty provision. Goff testified that he carefully considered the warranty language and that it was conservative and accurate as of the date made.

Subsequently, the plaintiffs, Krumholz and Moosmann, notified the Cantrell group and Goff by separate letters dated January 14, 1959, that they elected to exercise their options and would tender the balance of the purchase price at Greensburg on or about January 30, 1959. On that date, Krumholz and Moosmann came to Greensburg and informed Goff and the Cantrell group and their attorneys that they had been unable to raise sufficient funds to exercise both options, and after some discussion, paid Goff in full the cash consideration required by his option, and paid the Cantrell group the sum of $5,000 to be credited on the cash purchase price for an extension of their option. Thereupon, Goff and wife executed and delivered to Krumholz and Moosmann an assignment in the form of a quit claim conveyance of their 5/32 working interest in the lease,

and the Cantrell group executed and delivered to plaintiffs a written extension of their option to March 2, 1959. The Goff assignment dated January 30, 1959, described the leased property in general terms stating that it contained "80 acres more or less," and no reference was made to the production warranty of 400 barrels per day contained in the option of January 3, 1959.

On February 28, 1959, Krumholz and Moosmann and their attorney met with the Cantrell group and their attorneys in Greensburg for the purpose of paying the cash balance on the latter's 17/32 working interest and to close the transaction in accordance with the terms of the option. Several members of the Cantrell group testified that Krumholz on that occasion stated that everyone knew the lease was not producing 400 barrels per day as had been warranted, that an adjustment should be made, and if the Cantrell group would give plaintiffs the proceeds of the February, 1959, oil run attributable to their working interest, they would go ahead and close the deal. Krumholz and Moosmann testified there was no discussion of oil production on that occasion, and that they had no information that the actual oil production was below the warranty of 400 barrels per day until March 5, 1959, when they received a report from Buell Abney, an oil operator placed in charge of the lease by plaintiffs on March 2, 1959. In any event, the Cantrell group agreed to give Krumholz and Moosmann their share of the February oil production, and with this added condition, the Cantrell option was exercised on February 28, 1959, by paying the balance of the cash consideration, and, thereupon, the Cantrell group executed and delivered to plaintiffs an assignment of their 17/32 working interest by a conveyance identical with the Goff assignment, except for the interest assigned, and additional consideration to be paid.

A survey of the property received by Krumholz on February 28, 1959, indicated the leased property contained only 67 acres instead of "80 acres more or

less." A survey subsequently procured by the defendants showed the property as containing 67.5 acres, which the trial court found was correct.

Despite efforts of Buell Abney, the oil operator engaged and placed in charge of the property by plaintiffs on March 2, 1959, to increase oil production on the leased property, such production steadily declined and thereafter never reached the production warranty of 400 barrels per day. As a result, plaintiffs, by letters from their attorney to Goff and the Cantrell group dated March 23, 1959, demanded rescission of both assignments and restitution of money paid and expenses incurred. The defendants refused, and these suits followed.

Plaintiffs base their claims for rescission and restitution on two grounds, viz.: (1) fraudulent misrepresentation and breach of warranty regarding the daily production of oil; and (2) a material deficiency in the acreage of the property described in the assignments, amounting to a failure of consideration.

The case was submitted entirely on proof by depositions. The trial court found that the production warranty was false, constituting both a breach of warranty and a fraud upon plaintiffs, and, consequently, granted them relief as to the assignment by Goff and wife. However, the court also found that the plaintiffs, Krumholz and Moosmann, knew that the lease was not producing 400 barrels a day and did not rely on such warranty when they took the assignment from the Cantrell group on February 28, 1959, and hence, denied any relief as to that transaction.

On the issue of deficiency in acreage, the court held that plaintiffs were charged with information disclosed to their attorney by a title examination showing that the property contained only approximately 70.5 acres instead of "80 acres more or less" as set forth in the assignments, and the actual acreage of 67.5 acres being less than a 10% deficiency, revealed by such title examination, plaintiffs were entitled to no relief on this ground under Kentucky law.

■ Where, as in the instant case, the trial has been by the court without a jury, the Judge's findings of fact "shall not be set aside unless clearly erroneous." Rule 52(a), F.R. Civil P. A finding is "clearly erroneous" when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746. The clearly erroneous rule "applies also to factual inferences from undisputed basic facts." Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 1199–1200, 4 L.Ed.2d 1218. Also see In re Plonta (C.A. 6), 311 F.2d 44, 47.

■ There is substantial evidence that Krumholz and Moosmann knew, when they accepted the assignment from the Cantrell group, that the daily oil production was below 400 barrels and, therefore, plaintiffs did not rely on the production warranty at that time. Hence, the finding of the trial court to that effect must be sustained.

Whether there was a breach of the production warranty contained in both options presents a more difficult question. Counsel for the Goffs argue with considerable force and skill that the wells on the leasehold were *capable of producing* 400 barrels daily on January 3, 1959, when the Goff option was executed, that the production warranty speaks as of that date and not the date of January 30, 1959, when the option was exercised, and that the court erroneously placed the burden on Goff and wife to prove a breach of the warranty.

■ We agree that the production warranty relates to the time it was made and was not a continuing warranty as to production when the Goff assignment was executed nearly a month later. We also agree, as Goff contends, that representations as to future production of oil wells are mere expressions of opinion and will not constitute fraud, even though they turn out to be untrue. Terrill v. Carpenter (E.D.Ky.), 143 F.Supp.

747; Engemann v. Allen (Ky.), 201 Ky. 483, 257 S.W. 25. Neither do such statements constitute a warranty unless it sufficiently appears that the parties intended to warrant with respect to a future condition. 77 C.J.S. Sales §§ 302, 310, pp. 1119, 1142.

The leasehold was of recent development when Krumholz and Moosmann first met Goff on January 1, 1959. There were 12 wells on the property at that time and the 13th well then being drilled was not completed until January 19, 1959. Two wells had been drilled in October, 1958, before Goff acquired his ⁵⁄₃₂ interest, 4 wells were completed in November, and 6 wells were completed in December. Indeed, the 12th well was not "put on pump" until December 31, 1958. In this setting, Goff undertook to inform Krumholz and Moosmann on January 1, 1959, that the wells were producing, or were capable of producing, 600 barrels of oil per day, as hereinbefore mentioned. On January 3, 1959, Goff gave Krumholz and Moosmann the option to purchase his ⁵⁄₃₂ interest, which contained the 400 barrels' daily production warranty. All of the oil produced on the leasehold was purchased by Davidson Oil Company. The Goffs admit in their brief that "over a period of a month, it is fair to assume that the amount removed from the tanks by Davidson closely approximated the amount actually produced on the lease and pumped into the tanks during that period." Exhibits 17 and 18, prepared from Davidson Oil Company's records, show the complete oil deliveries from the lease and indicate, in part, as follows: a daily average of 253.19 barrels for December, 1958; a daily average of 303.26 barrels for January, 1959; a daily average of 150.17 barrels for February, 1959; a daily average of 281.84 barrels for the period December 25, 1958, through January 7, 1959, being the last week of 1958 and the first week of 1959; a daily average of 278.63 barrels for the months of December and January. On a few individual days shortly before and after January 3, 1959, deliveries exceeded 400 barrels.

Counsel for Goffs argue that these delivery records do not establish the *capacity* of the wells, in view of certain uncontradicted testimony to the effect that from time to time the pumps did not operate because of frozen lines to the tanks and the inability of Davidson's trucks to remove all the oil as fast as produced on account of bad road conditions at and near the lease, which also caused the tanks to sometimes overflow. Goff's testimony indicates these conditions prevailed mainly in January and that Davidson's trucks required assistance only 3 times in December. He also admitted that Davidson took delivery of oil from the lease every day in December and January except January 7th, as shown by the Davidson records. With reference to January 1, 1959, when Goff was at the lease with Krumholz and Moosmann, Goff testified:

"Q. Were you having difficulty getting all the oil that the wells would produce removed?

"A. Not right then we wasn't, no. That was the last of December or first of—no, we wasn't."

Goff also argues that the *daily capacity* of the wells exceeded 400 barrels and points to the testimony of the witness, Carl Wright, to that effect. Wright, who stated that he was engaged by Krumholz to test the wells, which Krumholz denied, did testify that he ran tests on the wells for short intervals from 15 minutes to 3 hours over a three-day period in early January, from which he determined that the wells were then capable of producing "612 barrels, as near as I could tell, if it had been running for the full 24 hours." Wright also testified that he so advised Krumholz by phone at that time, which Krumholz denied, but did admit that Wright told him "it was a terrific lease" and made other similar favorable reports of a general nature as to the production, in connection with seeking the job of operating the field for plaintiffs.

The trouble with these arguments is that the production warranty clause in question refers to "the daily production on this lease" and not to the capacity of the wells. The language of the warranty is clear and unambiguous. It means the actual production of the wells at that time, and not what they were capable of producing. The actual production, as of January 3, 1959, when Goff gave plaintiffs his option containing the production warranty, is sufficiently established by evidence of such actual production for a reasonable period of time, both before and after that date. The Davidson delivery records, as set forth in Exhibits 17 and 18, contain substantial reliable evidence that the daily oil production on the lease at that time was considerably under 400 barrels, as the District Judge found, and constituted adequate proof of the breach of the production warranty.

The defendants further contend that one who seeks to rescind a contract because of fraud must establish the fraud by clear, unequivocal and convincing evidence, and not by a mere preponderance of evidence. This is a well recognized principle of law.

However, a breach of warranty, one of the theories relied on by plaintiffs for rescission, needs only be established by a preponderance of the evidence. 77 C.J.S. Sales § 366, p. 1297; 20 Am.Jur. pp. 1103-4; Snead v. Waite, 306 Ky. 587, 208 S.W.2d 749.

We conclude that there was substantial evidence to support a finding of the trial court of a breach of warranty. Goff does not question or even discuss the sufficiency of the evidence to establish a breach of warranty, despite the holding of the District Judge in favor of the plaintiffs on this theory clearly set forth in his supplemental memorandum. On the other hand, Goff limits his argument on this point to the lack of evidence to establish fraud. In view of our holding on the breach of warranty theory,

it is unnecessary to decide the adequacy of evidence to establish fraud.

In the review of judicial proceedings, the rule is settled that if the decision below is correct, it must be affirmed, although the lower court may have relied upon a wrong ground or given a wrong reason. Helvering v. Gowran, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224; Sherman v. Air Reduction Sales Co. (C.A.6, 1958), 251 F.2d 543; Continental Ore Co. v. Union Carbide & Carbon Corp. (C.A.9, 1961), 289 F.2d 86. Also see Clifton Investment Co. v. Commissioner of Internal Revenue (C.A.6, 1963), 312 F.2d 719.

Still another contention of defendants, Goff and wife, that the trial court considered the burden of proof was upon them to sustain the warranty is not well taken. In support of this contention, Goff relies largely on an excerpt from the supplemental memorandum of the District Judge. The statements therein contained are nothing more than comment on the failure of Goff to come forward with proof to meet plaintiffs' evidence of actual oil production clearly shown by records of Davidson Oil Company to be substantially less than the production warranty. Neither this statement nor anything else in the opinion of the District Judge indicates that he considered the burden of proof was not upon the plaintiffs on this issue.

The ruling of the District Court on the acreage deficiency issue must also be affirmed. The assignments described the leased property as bounded by certain highways and other lands and "containing 80 acres more or less." This tract of land had been reduced by a conveyance of approximately 10 acres in 1943, which, presumably, was overlooked by the lessor in executing the lease in question. The property actually contained 67.5 acres.

Assuming, arguendo, that the acreage deficiency does fall within the so-called 10% rule in Kentucky [1] and

---

1. Equitable relief will be granted to a purchaser or seller if the discrepancy in

acreage is 10% or over, but denied if it is less than 10%. See 1 A.L.R.2d 9, 101.

not the exception pronounced in Wallace v. Cummins (Ky.), 334 S.W.2d 904,[2] and that the assignments do contain an implied warranty as to acreage, there is substantial evidence to support the finding of the District Judge that plaintiffs' counsel, Alvey, in examining the title prior to plaintiffs' exercising the Goff option, should have discovered the 10 acre sell-off causing the deficiency in question. In fact, Alvey testified that he did discover the 10 acre sell-off and reported it to Krumholz, who admitted that Alvey said something to him about 10 acres having been sold off some years before. Even if Alvey did not report this matter to Krumholz, plaintiffs are bound by the acts, knowledge and omissions of their counsel when he acts within the scope of his authority as in the instant case. Douthitt v. Guardian Life Insurance Co., 235 Ky. 328, 31 S.W.2d 377; Herfurth v. Horine, 266 Ky. 19, 98 S.W.2d 21; Baringer v. Kaufman's Admr., 289 Ky. 320, 158 S.W.2d 378.

■ The testimony clearly supports the finding of the District Judge that the acreage discrepancy between that shown by the record title (70 or 71 acres) and the actual acreage (67.5 acres) "can at most be only 3.5 acres," which is a discrepancy of less than 10%. For this reason, the District Judge held that the discrepancy in question did not entitle the plaintiffs to relief under the Kentucky 10% rule. We agree.

The plaintiffs were given judgment by way of restitution against both Goff and wife for the money paid for their 5/32 interest, with credit for payments received while plaintiffs had possession of the property, less maintenance expenses. The Goffs contend that the judgment is invalid as to Mrs. Goff because she did not sign the option, but did join in executing the assignment which did not contain the warranty clause.

■ There is no proof that Mrs. Goff even knew about the option warranty clause, in joining with her husband in executing the assignment. We agree that the judgment of restitution is invalid as to her, except insofar as any of the money paid by plaintiffs for the Goff interest can be traced to her or her estate, and the judgment shall be so modified.

■ The final issue raised by these appeals is that the judgment against the defendants, Goff and wife, is unenforceable for lack of being definite, perfect and complete. They argue that the court did not determine who then owned the 5/32 interest assigned by them to Krumholz and Moosmann and, therefore, they have no way of knowing that a tender of reassignment by the Krumholz group includes all rights of ownership in view of the amended complaint and testimony indicating that persons other than Krumholz and Moosmann contributed a portion of the funds used in these transactions. It should be noted that such other persons were not made parties to these actions and do not claim any ownership in the working interests of the lease. They merely advanced funds to Krumholz and Moosmann. It should also be noted that the judgment expressly provides that the reassignment of 5/32 interest by the Krumholz group shall be "as their interests may appear from the record in the County Clerk's office." We see no difficulty in making this determination.

■ The Goffs also argue that the credits allowed them under the judgment for oil sold and expenses incurred by plaintiffs to be applied against the cash consideration paid cannot be determined

---

This rule has been held to apply to coal and oil lands. See Caudill v. Bernheim, 194 Ky. 368, 238 S.W. 1041.

2. The 10% rule does not apply to a contract which refers to a quantity of acreage by estimation "only for the purpose of description and in such circumstances or in such manner as to show that the parties intended to risk the contingency of quantity whatever it might be or however much it might exceed or fall short of that which was mentioned in the contract." Wallace v. Cummins, supra, 334 S.W.2d p. 908.

584

from the record and that the judgment does not set forth the exact amount to be recovered of them by the plaintiffs. Unfortunately, such is the situation, and the District Judge felt obliged for lack of jurisdiction after appeal to deny a motion of plaintiffs to establish such credits and expenses filed after the filing of the notices of appeal.

The judgment in case No. 14863 is affirmed with costs. Case No. 14862 will be remanded to the District Court with instructions to amend the judgment in accordance with this opinion, and further testimony may be taken for such purpose, if necessary. The judgment in case No. 14862 as so amended will be affirmed without costs.