## Anderson v. Standard Accident Insurance Company.

(Decided November 18, 1924.)

### Appeal from Campbell Circuit Court.

1. Insurance—Evidence Held to Show Death Self-Inflicted.—In action on accident policy, evidence held to show that injuries causing death were self-inflicted.

2. Insurance—No Recovery for Self-Inflicted Death, Unless Insured so Insane as Not to Understand Act he was Committing.—Recovery for self-inflicted death could not be had under accident policy excluding liability for injuries intentionally self-inflicted, unless insured's mind was so far gone that he was unable to understand and know that act which he was committing would probably result in his death.

3. Insurance—Burden on Plaintiff, Suing for Self-Inflicted Death under Accident Policy, to Show Insanity.—In action for death of insured under accident policy, where it appeared death was self-inflicted, plaintiff must show that deceased did not have sufficient mind at time to know that act would probably result in his death, notwithstanding any presumption that may exist against suicide.

4. Evidence—Lay Witness May Give Opinion as to Mentality, but may Not Testify as to his Own Feelings or Impressions, what he said About it.—In testifying as to mentality of person, lay witness may give his opinion, and state facts on which he bases it, and describe manner, facial expression, and conduct of person, but he cannot testify as to his own feelings or impressions, or as to what he said to some one else about it.

5. Appeal and Error—Admission of Improper Evidence Held Not Prejudicial.—Admission of improper evidence concerning impres-

sion of witness that insured was going to commit suicide held not prejudicial, though erroneous.

L. J. CRAWFORD and L. J. CRAWFORD, JR., for appellant.

BARBOUR & BASSMAN, HARMON, COLSTON, GOLDSMITH & HOADLEY and BENTON S. OPPENHEIMER for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

Marie L. Anderson, as administratrix of Edwin L. Anderson, deceased, sued the appellee to recover $7,250.00 on a policy insuring her intestate "against loss resulting from bodily injuries effected directly, exclusively and independently of all other causes through external, violent and accidental means, except where intentionally self-inflicted, while sane or insane." She alleged that his death resulted from bodily injuries inflicted by some person other than himself, or by bodily injuries inflicted by himself, as to which she does not know, and if inflicted by himself, that it was done while he was insane, and while his mind was so far gone that he was unconscious of the fact that he was making an attempt to take his life, or that the act or attempt would result in his death.

The answer traversed all the allegations of the petition and pleaded that the bodily injuries resulting in the death of deceased were intentionally self-inflicted while sane or insane.

A trial before a jury resulted in a verdict for defendant and plaintiff has appealed. She complains of errors in the instructions and in the admission of evidence.

At the time of his death, May 12, 1918, Edwin L. Anderson was 65 years of age; he had been married twice, having been divorced from his first wife in 1914, his second marriage taking place in 1916. The policy in question was originally issued to his first wife, but after his later marriage was transferred to his second wife.

During his mature years, Anderson had been engaged in the liquor business in the capacity of a traveling salesman for a distillery company, and also on his own account as the proprietor of a mail order retail liquor business which he conducted in the city of Newport. The latter business was conducted by his employees while he was on the road, but he devoted his own time to it while at home; his supplies being largely purchased from the firm he represented as salesman. He is shown to have

been a man of fair ability; of good address; well groomed
and neat in his appearance; courteous in his dealings
with others, and while not amassing any property he had
succeeded in caring for his family and paying $100.00
per month alimony to his divorced wife.

The enactment of the national prohibition law de-
stroyed his business and changed the whole tenor of his
life; his employer retained him for six months after its
need for his services had ceased; within a year he dis-
posed of his stock of goods in the mail order business
and became involved in debt and mortgaged his property
to its value. He was unable to secure employment and
felt that he was too old to learn another trade; he also
worried about his son and daughter by his former marri-
age; the son was in the army and returned to Newport
on a furlough, but did not visit him or call him over the
telephone; he felt also that possibly he had mistreated
his daughter in marrying the second time, instead of
staying with her; he brooded over these matters and be-
came very nervous and careless in his dress. He talked
to his friends of what would become of him, that he had
nothing to live for, and that prohibition had ruined him;
he acquired the habit of drinking to excess; lost fifty
pounds in weight; was unable to attend to business; he
would sit in his office without talking to anyone; when
one of his employes quit work he insisted on his staying,
saying he dreaded staying in the building alone. To a
former employe who was helping him to close up his
business he said, "Men who worry as I do are people who
blow their brains out."

On Saturday before his death on Sunday, his former
secretary called upon him at his office; he was then de-
spondent and she suggested to him that she go in with
him in a mail order business, and would be back on the
following Tuesday to see him about it, and he said, "It
will be no use for you to come."

Five days before his death he wrote a note to his
wife. This was found on his desk immediately after his
death, and is in these words:

"May 7, 1918.

"To Maria:

"Goodbye darling wife. You have been a true
blue wife and companion to me, this act is no fault
of yours or anyone else. True love to my children

and may God bless and protect all of you—I don't feel I can get well. Am tired. No account & think it better thus for all. Paul & Ambrose is familiar with the business and should close it. I am a sinner. With love for all, your husband, E. L. Anderson."

Between seven-thirty and eight-thirty a. m. on the day of his death he was seen on his porch by one of his former employes, who spoke to him  Mr. Anderson did not speak or appear to see the witness, although looking directly at him. He was next seen about nine-thirty in the morning by one of his employes; he was then at his office and in the act of taking a drink of liquor; was intensely nervous and while the witness talked to him backed up to a packing bench and placed his hands behind him in a way indicating that he was either twisting a ring on his finger or grasping the bench. Witness made an engagement with him to return on Tuesday following and fix some screens.

At the time, a neighbor who lived within a few feet of Mr. Anderson's office was in his yard cutting grass; he saw the other gentleman leave; Mr. Anderson came to the door, spoke to him and talked for a few minutes in an ordinary tone and went back into the office. A couple of minutes afterwards witness heard a shot and rushing in the front door found Mr. Anderson lying in the hall. He called his (witness') wife, who states that she saw Mr. Anderson just shortly before that time and he was crying, wiping his eyes and touching his lips with a small white cloth; that he looked up, saw her and changed his expression. She followed her husband in the hallway. Mr. Anderson according to her statement was lying on his back, a pistol in his right hand, upon his breast; that it dropped down to his side and fell on the floor. She also found the article she had seen him caressing. It was an infant's "panties," possibly a memento.

Her husband thinks the pistol was lying on the floor when he entered. There was no sign of blood and the two undertook to give aid, in the meantime sending for a physician; they removed his glasses and blood began to come from his eyes and nose; he lived but a few minutes, and when examined by the physician, it was discovered that the shot entered his mouth.

While all the witnesses agreed as to deceased's intensely nervous disposition, no one of them gave an opinion as to deceased's insanity.

The court gave the following instructions:

"No. 1. If the jury believe from the evidence that within twenty days after the death of Edwin L. Anderson the plaintiff notified defendant's authorized agent at Cincinnati, O., of the death of said Edwin L. Anderson, and that the death of said Edwin L. Anderson resulted from bodily injuries effected directly, exclusively and independently of all other causes through external, violent and accidental means, and was not intentionally self-inflicted while sane or insane, they will find for plaintiff in the sum of $7,250.00 with interest thereon from the 21st day of January, 1922, the date of the filing of the petition herein, otherwise they shall find for defendant.

"No. 2. Although the jury may believe from the evidence that E. L. Anderson was insane at the time he shot himself, if he did shoot himself, yet the jury should find for defendant unless they should believe from the evidence that at the time he did so, he was so insane that he did not know that the act he was committing would probably result in his death."

And refused the following instruction offered by plaintiff:

"No. 'Y.' If the jury believe from the evidence that said Edwin L. Anderson took his own life by shooting himself with a pistol at a time when his mind was so far gone that he did not know that the act of firing a bullet from a pistol into his head would likely bring about his death, the act will not be deemed his act but will be regarded in law as an accidental killing."

From a recital of the facts we cannot escape the conclusion that the deceased's injuries were self-inflicted. True the evidence was circumstantial, and if upon the facts proven, a different hypothesis might reasonably be predicated, an issue might be raised on such hypothesis, but the different steps in the tragedy are so clearly expressed as to preclude the idea of anyone else firing the

fatal shot, or of its being an accident in the ordinary sense of the term.

There is no affirmative evidence indicating insanity, but perhaps an inference may be drawn that the deceased was impelled by some irrational impulse beyond his control to take his own life. This would absolve him from moral culpability, but would not authorize a recovery upon the policy "unless his mind was so far gone that he was unable to understand and know that the act which he was committing would probably result in his death." Inter-Southern Life Ins. Co. v. Boyd, 124 S. W. 333; Mutual Benefit Life Ins. Co. v. Daviess, &c., 87 Ky. 541; Columbia National Life Ins. Co. v. Wood, 193 Ky. 395. But Masonic Life Ins. Co. v. Pollard's Gdn., 28 Rep. 301, and May on Ins., section 325, are cited to the effect that "the law indulges a presumption against suicide as being unnatural and immoral," and it is insisted that this presumption places the burden upon the defense of showing that the deceased did have sufficient mind to understand the act he was committing would probably result in his death.

In Mutual Benefit Life Ins. Co. v. Daviess, 87 Ky. 541, the court seems to have adopted appellant's view; but instructions similar to instruction No. 2 herein, and directly contrary to appellant's contention, have been approved in a number of the later cases. Inter-Southern Life Ins. Co. v. Boyd, 124 S. W. 333; Columbia National Life Ins. Co. v. Wood, 193 Ky. 395; Metropolitan Life Ins. Co. v. Thomas, 32 Rep. 770. See also Hobson on Instructions, section 283, and this is now the established rule.

The burden was upon appellant to show that the injuries were inflicted by someone else, or that they were accidental. As it appears they were self-inflicted, in order to recover she must show that they were the result of an accident in the ordinary sense, or show that the deceased did not have sufficient mind at the time to know that the act would probably result in his death. In this the burden was upon her, and it is not affected by the presumption cited *supra*. It follows that if a submission to the jury was proper the appellant was not prejudiced by the instruction given, nor by the refusal to give instruction "Y" offered by her. In this view of the case

it is not deemed necessary to discuss the propriety of the peremptory instruction asked by defendant.

Reference is made above to a conversation between the deceased and his former secretary, Mrs. Berry, on Saturday before his death. In addition to her statement, *supra,* she was permitted to state the impressions that his conversation made upon her, "that she felt he was going to commit suicide. . . . I felt like if I would turn around I would see him on the pavement behind me, because the very next morning I sent my children home when I seen the crowd running out the street, and I said, 'I suppose they found Mr. Anderson's body.' "

In testifying as to the mentality of a person, a lay witness may give his opinion, and state the facts upon which he bases it, and describe the manner, facial expression and conduct of the person, but we are not aware of any rule that would authorize a witness to testify as to his own feelings or impressions, or as to what he said to someone else about it. We think the evidence improper, but for the reasons above given, it could not affect the merits of the case; the conclusions reached.

Perceiving no error the judgment is affirmed.