**COMMONWEALTH LIFE INSURANCE COMPANY, Appellant,**

v.

**Shelba J. HALL, Appellee.**

Court of Appeals of Kentucky.

Dec. 13, 1974.

William D. Lambert, Ogden Robertson & Marshall, Louisville, William G. Reed, Carrollton, for appellant.

John G. Wright, Joseph F. Bamberger, Warsaw, for appellee.

PALMORE, Justice.

Commonwealth Life Insurance Company appeals from a judgment awarding $53,000 to the appellee, Shelba J. Hall, as the beneficiary of three insurance policies on the life of her husband, Elmer E. Hall.

Hall's death resulted from a shotgun wound in the heart. His life was insured under four policies issued by Commonwealth, as follows:

1. A policy of credit insurance covering the unpaid balance of a mortgage loan on his home. This policy was satisfied by payment of $12,495.00.

2. A $1,000 burial policy with $3,000 additional benefit payable in the event of death by accidental means. The $1,000 was paid and the $3,000 is a part of the amount for which suit was brought and a jury rendered its award of $53,000.

3. A $10,000 group policy with double indemnity for accidental death. The company paid $10,000 and the addi-

tional $10,000 is a part of the $53,000 awarded by the jury.

4. A $20,000 policy with double indemnity for accidental death and an exception of all liability other than a return of premiums paid in the event of death "as a result of self-destruction, whether sane or insane, or any attempt thereat." Mrs. Hall accepted a return of premiums in the amount of $90.26 paid under this policy but, after securing the advice of counsel, renounced the agreement and tendered the $90.26 back to the company. The verdict awarded the full amount of $40,000 on this policy, and on the issue of accord and satisfaction joined by the pleadings the trial court found as a fact that in accepting a return of the premiums Mrs. Hall was not capable of understanding the nature and effect of her actions.

The insured's death occurred on June 21, 1967. He was 36 years of age, married, and had one child, a daughter, Scarlett, about 6 years old. He had been employed as a Kentucky State Trooper for 14 years until January of 1967, when he resigned and accepted employment with the defendant company, Commonwealth Life Insurance Company, as an insurance salesman. He appeared to be well satisfied with his new occupation, was earning more money than he had received as a police officer, and was able to be home and spend more time with his family. They were out of debt except for the mortgage on their home in Warsaw, Kentucky. His wife, the appellee, worked for the local production credit association and her mother, who made her home with them, worked at a grocery store. On the morning of June 21, 1967, as was customary when her parents and grandmother were away at work, the little daughter was being looked after by Mrs. Viola Reffett, a next-door neighbor.

At some time around 11:00 A.M. on this particular day Mrs. Reffett, sitting on her

porch with another neighbor, heard a shot but thought nothing of it until, perhaps half an hour later, Scarlett, who had gone into her own house, came out crying that her father had been shot. Help was summoned at once, and the sheriff, Milford Wheeler, and a physician, Dr. John Fielding, arrived very shortly. They opened the overhead door of the garage attached to the house and found Hall lying on his face in the middle of the garage, shot through the heart. His arms lay above (beyond) the head, with elbows bent. A .12-gauge pump-gun was lying on the floor under his right ankle. A half-unfolded 2-section newspaper was on the floor next to his right elbow. There were no materials or instruments present to suggest that he may have been cleaning or preparing to clean the gun.

The gun had been given to Hall by his wife on some previous Christmas. It has a 26-inch barrel with a polychoke and measures 31½ inches from muzzle to trigger. It was introduced in evidence and appears upon cursory inspection to be in good mechanical condition. When examined by the sheriff on the scene it was found to contain one discharged shell. There was no ammunition in the magazine and no shells, either live or spent, could be found elsewhere on the premises. The deceased had been shot in the chest near the left nipple, the charge having ranged inward at an angle of 45° to 55° from perpendicular insofar as could be ascertained by probing to a depth of an inch to an inch and one-half. Both the shirt Hall was wearing and the skin around the wound showed powder burns. The estimated diameter of the wound was between one and 1½ inches. The bore of a .12-gauge shotgun is .729 inches. However, the setting of the polychoke at the time in question was not shown, nor was the shirt introduced in evidence. It was estimated that Hall was five feet 11 inches tall and weighed about 175 pounds. It can be fairly inferred from the evidence that he could easily have held the

muzzle of the gun at or near his chest and touched the trigger off with his finger.

June 21, 1967, fell on a Wednesday. The evidence did not disclose Hall's work schedule, if he had one, but the fact that Scarlett was left with her babysitter suggests at least that he was not expected to remain at home. As it happened, Mrs. Reffett noticed him leave and come back, using his automobile, several times during the morning. On one of his trips he stopped at a local farm supply store and bought "a few" ("four, five or six") shotgun shells, which the sales clerk testified was not unusual for customers to do. The clerk did not recall the size of the shells, and there was nothing in the words exchanged during the transaction to indicate the purpose for which Hall intended to use them.

From time to time the deceased left affectionate little notes for his wife when he was to be away. One of these, written two days before his death, was as follows:

"Honey,

If I don't see you sometime this afternoon I'll be home for supper at 6:00. You won't have to fix to much. If you go to the Drug Store will you buy 3 or 4 more papers. Love you more than ever. Stop worry I'll make it.

Love
Elmer."

Mrs. Hall was not asked for and did not volunteer any explanation with respect to the "worry" to which this note made reference.

Hall had applied for the $20,000 double-indemnity policy on April 27, 1967, and it was issued on May 19, 1967, a month before his death. Though under other circumstances this might have had some significance with respect to the probability, vel non, of suicide, it must be remembered that he had just gone to work for this particular insurance company.

The witness Jack Parks was an assistant agency manager for Commonwealth and was Hall's supervisor. His relationship was such that he served as one of the pall-bearers at the funeral, which was held on the Saturday following Hall's death on Wednesday, June 21. On Monday, June 26, he came to the house in order to secure and complete the proofs of death required under the various policies heretofore mentioned. Included among these proofs were statements by Dr. Fielding and the undertaker (who was also the county coroner) giving suicide as the cause of death and a statement signed by Mrs. Hall (but prepared by Parks) which likewise indicated suicide as the cause of death. A week later, on July 3, Parks returned with the settlement drafts, including the $90.26 check and the payments under the other policies mentioned above, and on this occasion Mrs. Hall purchased from him a $15,000 policy on her own life.

■ Mrs. Hall testified that she was not in a condition to conduct any business on June 26, 1967, and that she did not remember what she signed at that time. She was taking a tranquilizing drug prescribed by Dr. Fielding, and from her own and her mother's testimony there is ample support for the conclusion that she was quite distraught for a long period following the tragic death of her husband. Though much time and argument have been devoted in the briefs to the accord-and-satisfaction issue, we are not disposed to give it much space. It is utterly beyond cavil that this grieving widow did not have sufficient understanding of her rights and prospects under the insurance policies to question the judgment of one who had her trust and confidence but nonetheless, however honestly and in good faith, was acting for his company, which in this matter was her unrecognized adversary. Suffice it to say that it would not be conscionable to enforce an accord and satisfaction consummated under such circumstances.

Returning now from that brief digression, it appears that after Mrs. Hall received advice of counsel steps were taken to secure a coroner's inquest, which culminated in a verdict to the effect that the cause of death was accidental, and in due course an official death certificate was filed in which it was recited that the death resulted from a gunshot wound accidentally sustained while the deceased was cleaning or preparing to clean a shotgun.

■ The case went to trial on the widow's claim of death by accident and the insurance company's defense of death by suicide. There being no issue as to the fact of death, the widow was entitled to recover $20,000 under the policy of May 19, 1967, unless the jury were to find that the death resulted from suicide, and she was entitled to recover additional benefits of $20,000 under that policy, $10,000 under the group policy, and $3,000 under the burial policy if she succeeded in proving accidental death. She had the burden of proof on the issue of accidental death and the company had the burden on the issue of suicide.[1] Cf. Kentucky Home Mut. Life Ins. Co. v. Watts, 298 Ky. 471, 183 S.W.2d 499, 504 (1944); Prudential Ins. Co. v. Tuggle's Adm'r, 254 Ky. 814, 72 S.W.2d 440, 443–444 (1934). Under a single instruction submitting the theory of accidental death the jury returned a verdict awarding the plaintiff $53,000.

1. Assuming a sufficiency of the evidence to present each of these issues, a proper submission would have directed the jury to return a verdict for $53,000 if it believed from the evidence that the death was accidental and not intentionally inflicted by the insured upon himself, but otherwise to award the plaintiff $20,000 unless it believed from the evidence that the insured killed himself intentionally, in which event it should find for the defendant. Actually, however, the instruction given to the jury assumed (erroneously) that its failure to find accidental death would be tantamount to a finding of suicide, and did not allow for the possibility that the jury may not have been persuaded one way or the other.

During the course of the trial the court correctly and properly ruled inadmissible the result of the coroner's inquest and that portion of the death certificate which stated that the gunshot wound had been inflicted accidentally. Cf. Kentucky Home Mut. Life Ins. Co. v. Watts, *supra,* at 183 S.W.2d 501–503.[2]

The insurance company's contention that the evidence was not sufficient to support a verdict of accidental death raises once again the well-worn questions of whether and to what extent the presumption against suicide serves to avoid a directed verdict against a party bearing the burden of proving accident as the cause of death. See for example, Masonic Life Ass'n v. Pollard, 121 Ky. 349, 28 K.L.R. 301, 89 S.W. 219 (1905); Anderson v. Standard Acc. Ins. Co., 205 Ky. 587, 266 S.W. 237 (1924); Inter-Southern Life Ins. Co. v. Hinkle's Adm'x, 226 Ky. 724, 11 S.W.2d 913 (1928); Massachusetts Mut. Life Ins. Co. v. Bush, 236 Ky. 400, 33 S.W.2d 351 (1931); Kentucky Home Mut. Life Ins. Co. v. Watts, 298 Ky. 471, 183 S.W.2d 499 (1944); Thelen v. Mutual Life Ins. Co. of N. Y., Ky., 261 S.W.2d 427 (1953), and Commonwealth Life Ins. Co. v. Auxier, Ky., 470 S.W.2d 335 (1971). A presumption against suicide, of course, amounts in practical effect to a presumption of accident when both issues are presented and there is no evidence of foul play.[3]

We shall make no effort to enlarge the literature on the subject. For the interested reader, it is discussed quite adequately in Prosser on Torts, § 38 at p. 209 (4th ed., 1971), and in Hinds v. John Hancock Mut. L. Ins. Co., 155 Me. 349, 155 A. 2d 721, 85 A.L.R.2d 703 (1959), with an annotation following at 85 A.L.R.2d 722 (1962). In this jurisdiction, where the burden of proof is fixed by the pleadings and the existence of a presumption is not communicated to the jury, its procedural effect[4] is a matter of law to be determined by the trial court.

Our opinions have struggled with the question of what quantum of evidence is required in order to make the presumption against suicide "disappear," and most often have found it to be the point at which the proof of suicide is strong

2. Jones' Adm'x v. May, 310 Ky. 706, 221 S.W.2d 617, 619 (1949), and Kirkshouse v. Eastern Kentucky University, Ky., 501 S.W.2d 581, 582 (1973), do not have the effect of overruling Kentucky Home Mut. Life Ins. Co. v. Watts, 298 Ky. 471, 183 S.W.2d 499, 501–503 (1944), with respect to what are the "facts" stated in a death certificate. For purposes of the distinction between fact and law, an opinion as to the physiological cause of death may be a "fact." Cf. Terry v. Associated Stone Co., Ky., 334 S.W.2d 926, 928 (1960). But a conclusion as to whether it was brought about accidentally is not.

3. It was observed in Louisville and Nashville Railroad Co. v. Fisher, Ky., 357 S.W.2d 683, 688 (1962), that the presumption against suicide "is nothing more or less than saying that if the insurance company, having the burden of proof, does not show how the insured came to his death, it has failed to establish its defense." There has never been a presumption of accident, as such; hence it is only by indirection that the presumption against suicide can have a bearing on the evidence required in order to sustain the burden of proving accident.

4. That is, within the terminology of Bell & Koch, Inc. v. Stanley, Ky., 375 S.W.2d 696 (1964), does it amount to a permissible inference, a rebuttable presumption, or a conclusive presumption, and to what does it amount after all the evidence is in? Despite its author's semantic objection to our alleged bastardization of the once-artful word "presumption," for a graphic exposition of how presumptions may shift the onus of persuasion and risk of nonpersuasion back and forth during the course of trial, see Lawson, The Law of Presumptions, 57 Ky.L.J. 7 (1969). Much the same process occurs with respect to the evidence in any case, regardless of presumptions. Hence this court has consciously chosen a broad use of the word to characterize the stage at which the evidence will entitle the party with the burden of proof to a favorable directed verdict. Our concern has been more for what conclusions are reasonably justified or demanded by the evidence than for the traditional pigeonholes into which it may fit.

enough to call for a directed verdict. Short of that point, the court has been disposed to leave the matter to the jury, but until 1940 the cases so holding were decided under the scintilla rule, which was abolished in Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S.W.2d 877, 883 (1940), in favor of the principle that the burden of proof must be supported by "substantial evidence" in order to warrant submission to the jury. Cf. Thelen v. Mutual Life Ins. Co. of N.Y., Ky., 261 S.W.2d 427 (1953).

In Kentucky Home Mut. Life Ins. Co. v. Watts, 298 Ky. 471, 183 S.W.2d 499, 501 (1944), it was held that from the facts proved it would have been reasonable for the jury to infer that the death weapon had fired accidentally while being removed from a rack by the insured, and that the evidence pointing to suicide was likewise sufficient for submission to the jury.

In Thelen v. Mutual Life Ins. Co. of N. Y., Ky., 261 S.W.2d 427 (1953), the evidence indicating suicide was held conclusive. However, in the course of its opinion the court quoted from Aetna Life Ins. Co. v. Tooley, 16 F.2d 243, 244 (5th Cir. 1926), to the effect that the presumption against suicide is overcome only when the evidence is inconsistent with *any reasonable hypothesis* of death by accident or by the act of another. Then, seizing upon that same quotation, we employed language in Commonwealth Life Ins. Co. v. Auxier, Ky., 470 S.W.2d 335, 338 (1971), from which one might draw the conclusion that if there is a hypothesis of accidental death that is not "physically impossible" the issue must be left to the jury. We did not, however, mean to convey that impression. Somewhere in the amalgam of common sense the contrast between probabilities and speculation must fall into reasonable perspective.

Though we do not harbor the illusion that any rule, short of a complete abolition of the presumption against suicide, will have the magic of providing a simple remedy for this vexing question, we find what appears to be a reasonable, sound and certainly well-considered approach in Rule 704 of the Model Code of Evidence adopted by the American Law Institute in 1942, which is paraphrased as follows:

1. When the basic fact giving rise to the presumption has been established, the presumed fact stands as a matter of law unless and until evidence has been introduced which would *support* a contrary finding (or a basic fact giving rise to a contrary presumption has been established).

2. When the basic fact giving rise to the presumption has been established, but evidence has been introduced which would *support* a contrary finding (or a basic fact giving rise to a contrary presumption has been established), then the existence or non-existence of the presumed fact is to be determined exactly as if no presumption had ever been applicable.[5]

What this means, in an "accident or suicide" case, is that once it is established that the death occurred under such circumstances that it must have been accidental or a suicide, but could have been either, there is a rebuttable presumption that it was accidental, and in the absence of evidence that would support a finding of suicide a verdict must be directed accordingly. If, however, upon the whole case the evidence would sustain a finding of suicide, the effect is the same as if there were no presumption, which means that if the evidence would not support a finding of acci-

5. Rule 14 of the Uniform Rules of Evidence, approved by the American Bar Association and the American Law Institute in 1954, eliminates the presumption when the facts from which it arises "have no probative value as evidence of the presumed fact." Rule 301 of the Federal Rules of Evidence apparently gives a presumption sufficient probative force to carry the case to the jury despite substantial countervailing evidence, and the jury may be instructed that it can infer the presumed fact from the basic fact giving rise to the presumption.

dental death except for the presumption, the theory of accidental death cannot be submitted. In other words, if without the presumption the evidence upon the whole case, with all inferences that may reasonably be drawn from it, affords no substantial basis for concluding that the death was accidental, but does provide a basis upon which the jury could reasonably find that it was a suicide, the jury cannot be permitted to find that it was accidental. Yet the jury may not be satisfied that it was suicide either, in which event the beneficiary of an insurance policy carrying double indemnity and a suicide exclusion recovers the amount payable for non-accidental death.

Since the presumption against suicide is founded on natural probabilities in the first place, there is no need for it to be given artificial weight when the evidence itself provides a more reliable basis for determining the cause of death. All other things being equal, the presumption has a place, otherwise not.

■ In this case the basic tact giving rise to the presumption is that the insured was found dead of a gunshot wound. Nothing else being shown, the presumption would operate to establish as a matter of law that the fatal wound was not intentionally self-inflicted. Except, however, for the presumption this conclusion would be entirely speculative, and therefore insufficient to warrant a verdict to that effect. On the other hand, the rest of the evidence in the case, while adding nothing further of substance to justify a conclusion that the wound was accidental, supplies details reasonably sufficient to support a finding that it was intentionally self-

inflicted.[6] Therefore, treating the case exactly as if there were no presumption, the only question that should have been submitted to the jury is whether it believed from the evidence that the insured intentionally killed himself. If so, the insurance company was entitled to a verdict; if not, the beneficiary was entitled to an award of $20,000.

■ In its motion for a directed verdict at the conclusion of the evidence the insurance company relied specifically on the ground that the plaintiff had not sustained the burden of proving that the death was accidental. This ground would not have entitled it to a directed verdict on the issue of suicide, but we consider it sufficient to raise and preserve the company's objection to submitting the issue of accidental death, even though it thereafter tendered the instruction by which that issue was actually submitted to the jury.

The company claims error also in the trial court's refusal to declare a mistrial by reason of various improper remarks made by counsel for the insured to and in the presence of the jury. Most of these objections are well taken, though we need not determine whether any or all of the remarks in question were such as to require a mistrial. We address the subject only for the purpose of guidance in the event of a retrial.

The trial was hotly contested. Some blows landed above the belt, some below, and some did not land at all, but the principal refrain of the insurance company's complaint is that counsel for Mrs. Hall, in one form or another, made repeated reference to the coroner's jury after the trial

---

6. The circumstances under which the insured shot himself virtually exclude the likelihood that he did so accidentally. There was no evidence whatever to suggest that the fatal weapon could or would fire unless the trigger was pulled. Assuming, however, that it would—for example, when the butt was dropped against the floor—the chance that this would accidentally occur at the very moment the muzzle was directed at the vic-

tim's breast must be infinitesimal indeed. Unlike the classic instance of the hunter's leaning his gun against a fence, there was nothing nearby, except the insured himself, on which this gun could have been propped or from which it could have fallen. From a disinterested viewpoint there can be but one conclusion as to the probability of accidental death in this instance.

court had excluded its verdict from the evidence offered in her behalf. In fact, at one point the court advised counsel that if he heard any more mention of it he would grant the company's motion for a mistrial. We might find all of this quite moving were it not for the fact that counsel who made the company's opening statement had already told the jury that after Mrs. Hall accepted the money "someone . . . conceived the idea that if a coroner's inquest were held and the verdict of accidental death were returned, and they could obtain a death certificate which could be used as evidence . . . showing death by accident, they could force and annoy the company into settling under the accidental feature of the policy . . . . and sure enough, there was a verdict of accidental death returned by that jury . . . And following that, carrying out the plan they had devised, they obtained a death certificate showing that Elmer Hall met his death by accident." Though it was wrong for opposing counsel to keep alluding to the subject after the trial court had held it inadmissible, obviously this previous disclosure drained from the subsequent references most of the prejudice they would otherwise have created. The following remarks by counsel also were improper and should not be repeated if the case goes to trial again:

1. The suggestion (without evidentiary foundation) that the defendant company's failure to use witnesses it had subpoenaed should somehow be considered as evidence against it.

2. The statement that although counsel would accede to the trial court's ruling on the preceding point, "I certainly want to reflect that I do not agree in this situation. I do not agree that it was wrong."

3. The "apology" for counsel's profession because opposing counsel had interrupted his summation to the jury by frequent objections. (Whatever apologies may have been due in this respect were for counsel's own conduct in making the objections necessary.)

4. Mention of "the evidence that you have heard and the evidence that you have not heard."

5. The remark "that it's a little woman against a big company . . . . . . Now, there has been no attempt to characterize the big company. We tried to keep away from it. Scarlett has not been in the Courtroom. That would have been one of the nicest tricks we could have pulled . . ."

In the event of a new trial, if the evidence be substantially the same the jury should be instructed to find for the plaintiff in the sum of $20,000 unless it believes from the evidence that the insured killed himself intentionally, in which event it should find for the defendant.

The judgment is reversed with directions for a new trial.

All concur.