820 F.2d 1225
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Beverly Gail Burns SMITH, Plaintiff-Appellant,
v.
BANKERS LIFE AND CASUALTY CO. (86-5761) & John Hancock
Mutual Life Insurance Company (86-5786),
Defendants-Appellees.
 Nos. 86-5761, 86-5786
 United States Court of Appeals, Sixth Circuit.
 June 22, 1987.
 
 Before JONES and NELSON, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff Smith appeals the summary judgment entered in favor of defendants Bankers Life and Casualty Company (Bankers Life) and John Hancock Mutual Life Insurance Company (John Hancock) on Smith's claims for accidental death benefits under separate insurance policies issued by the defendants. Because we find no error in the district court's ruling, we affirm.
 
 
 2
 Gordon Mathis, appellant's decedent, died from a single self-inflicted gunshot wound to the head on September 8, 1982. Mathis, a former policeman and recent employee of the Ford Motor Company, had lost his wife to cancer six months prior. He had been dating a woman regularly since his wife's death and his neighbors and acquaintances testified in depositions that he appeared to be adjusting well to his wife's passing. A psychologist hired by the plaintiff below, Dr. Noekler, conducted telephone interviews with various friends and acquaintances and opined that the decedent exhibited none of traditional warning signs of suicidal tendencies.
 
 
 3
 Mathis had planned to have a party the day he died with a group of old friends from his days in the National Guard. Although he invited many people, the only person to show up was his long-time friend, Clarence Kirkpatrick. Mathis and Kirkpatrick drank and talked from 4 p.m. until late in the evening--Mathis was drinking beer and mixed drinks, Kirkpatrick consumed over a fifth of whiskey.
 
 
 4
 Kirkpatrick recounted the events of that evening in two separate depositions. He testified that Mathis asked him if there were any personal belongings of Mathis' that he wanted. The conversation became more morose as the evening progressed. Mathis expressed his profound sadness over the death of his wife, as well as his dissatisfaction with his new job. He said he wanted to quit work and go into business for himself as an over-the-road truck driver. He wanted Kirkpatrick to go into business with him, but Kirkpatrick declined citing nervousness over his recent heart surgery. At that point, Mathis got up from the kitchen table where the two were sitting and left the room. He returned shortly with a handgun. Kirkpatrick testified that Mathis laid the revolver on the table and repeatedly urged Kirkpatrick to 'try this out. If you are in that bad a shape, try that out.' After declining numerous times, Kirkpatrick finally acceded to Mathis' directives, picked up the gun and pointed it at the kitchen floor. Kirkpatrick pulled the trigger three times; the third time the gun fired.
 
 
 5
 After the gun discharged, Kirkpatrick quickly emptied the bullets from the chamber on the kitchen table. He testified that Mathis got up and walked to the point in the floor where the bullet entered and said: 'Man, look at the damn hole you put in my floor. I never will get that patched right.' Without saying another word, Mathis picked up the empty revolver from the table, left the room momentarily, returned and sat across from Kirkpatrick, placed the gun to his right temple and pulled the trigger.
 
 
 6
 Smith does not now contest, and did not contest below, that the fatal wound was self-inflicted. Kirkpatrick was the only eyewitness. Moreover, the police and forensic reports, including the powder burns on Mathis' temple and the trajectory of the bullet, confirm Kirkpatrick's story.
 
 
 7
 Smith did, however, depose an expert witness on pharmacology and toxicology, Dr. Cowan, who testified as to the probable effect of alcohol on Mathis and Kirkpatrick. An autopsy revealed that Mathis' blood alcohol level was .20%. Dr. Cowan testified that this blood alcohol level would place him at the 'confusion' and 'excitement' stage. He characterized people at this stage as typically exhibiting signs of 'loss of critical judgment, decreased inhibitions, impairment of memory and comprehension [as well as] disorientation, mental confusion, dizziness, [and] exaggerated emotional states.' While Kirkpatrick did not undergo a blood alcohol analysis, Cowan estimated his blood alcohol level at .29%. This estimate was based upon Kirkpatrick's size and weight, the amount of alcohol and food consumed, and the time span of consumption. Cowan testified that this higher level placed Kirkpatrick between the 'confusion' and 'stupor' stages.
 
 
 8
 The district court granted the companies' separate motions for summary judgment, ruling that '[a]fter prolonged opportunity for discovery there is no basis for concluding that Mr. Mathis's death was accidental and, in fact, plaintiff has presented no theory by which such a conclusion could be indulged in by a jury.' The district court also held that the question of Mathis' mental condition at the time of his death was not relevant to this inquiry.
 
 
 9
 On appeal, Smith contends that the district court erred in granting the companies' motions for summary judgment for two reasons. First, Smith argues that it was error to conclude that there was no basis upon which a jury could conclude that Mathis' death was 'accidential.' Second, Smith maintains that the district court incorrectly ruled that Mathis' mental condition at the time of his death was irrelevant.
 
 
 10
 The appellate court applies the same test used by the district court in reviewing a motion for summary judgment. Hand v. Central Transport, Inc., 779 F.2d 8, 10 (6th Cir. 1985) (per curiam). Accordingly, where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits on file, construed favorably to the nonmoving party, do not raise a genuinely disputed issue of material fact for trial, the entry of summary judgment is appropriate. Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2555 (1986).
 
 
 11
 The accidental death policy issued by Bankers Life defined injury as follows:
 
 
 12
 'Injury' whenever used in this policy means bodily injury occurring while this policy is in force as to the Insured Person or Insured Dependent whose injury is the basis of claim and causing the loss directly and independently of all other causes and affected solely through an accidental bodily injury to the Insured Person or Insured Dependent.
 
 
 13
 App. 40. Likewise, the John Hancock policy provided:
 
 
 14
 If an employe has an accidental injury and dies or incurs any of the other losses described below as a result of, and within one year of such accident, the Insurance Company shall pay to such employe, if living, otherwise to his designated beneficiary, upon receipt of due proof, as required herein, the benefit specified for such loss . . ..
 
 
 15
 App. 42. The latter policy defined accidental injury as 'one that occurs directly and solely through external, violent and accidental means.' Both policies provided an exclusion from coverage for self-destruction, while sane or insane.
 
 
 16
 The substantive law of Kentucky applies to this diversity case. Under Kentucky law, the beneficiary of an accidental death insurance policy carries the burden of persuasion on the issue of the insured's accidental death. The insurance company is said to carry the burden of proving suicide. $1Commonwealth Life Ins. Co. v. Hall, 517 S.W.2d 488, 491 (Ky. 1974). It is also said that there is a presumption against suicide in such cases.
 
 
 17
 What this means, in an 'accident or suicide' case, is that once it is established that the death occurred under such circumstances that it must have been accidental or a suicide, but could have been either, there is a rebuttable presumption that it was accidental, and in the absence of evidence that would support a finding of suicide a verdict must be directed accordingly. If, however, upon the whole case the evidence would sustain a finding of suicide, the effect is the same as if there were no presumption, which means that if the evidence would not support a finding of accidental death except for the presumption, the theory of accidental death cannot be submitted. In other words, if without the presumption the evidence upon the whole case, with all inferences that may reasonably be drawn from it, affords no substantial basis for concluding that the death was accidental, but does provide a basis upon which the jury could reasonably find that it was a suicide, the jury cannot be permitted to find that it was accidental.
 
 
 18
 Id. at 493-94 (emphasis added).
 
 
 19
 The district court in the instant case found that the evidence of record--both uncontested and contested but construed favorably to the beneficiary--could not support a jury finding of accidental death as that term is defined in Kentucky jurisprudence. The district court relied on the case of Donohue v. Washington Nat'l Ins. Co., 82 S.W.2d 780 (Ky. 1935), for the definition of that term. However, subsequent to the decision below, the Kentucky Supreme Court revisited this issue and stated:
 
 
 20
 The words 'accident', 'accidental', and 'accidental means', as used in insurance policies, have never acquired a technical meaning in law, and must be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured. Donohue v. Washington Nat. Ins. Co., 259 Ky. 611, 82 S.W.2d 780 (1935). An accident is generally understood as an unfortunate consequence which befalls an actor through his inattention, carelessness or perhaps for no explicable reason at all. The result is not a product of desire and is perforce accidental. Conversely, a consequence which is a result of plan, design or intent is commonly understood as not accidental.
 
 
 21
 .............................................................
 
 
 22
 ...................
 
 
 23
 * * *
 
 
 24
 We are therefore of the opinion that unless otherwise excluded by the terms of the life insurance policy, a death is accidental absent a showing that the death was a result of plan, design or intent on the part of the decedent.
 
 
 25
 Fryman v. Pilot Life Ins. Co., 704 S.W.2d 205, 206 (Ky. 1986).
 
 
 26
 Smith's argument relies on the Fryman case, as well as an old line of Kentucky cases holding that a beneficiary may recover under an accidental death policy where the insured takes his own life at a time when he was so insane as not to realize that the act would likely result in his death--despite express policy language excluding coverage in the case of 'suicide, whether sane or insane.' See, e.g., Columbian Nat'l Life Ins. Co. v. Wood, 236 S.W. 562 (Ky. 1921). Her theory, in a nutshell, is that Mathis was so drunk that there is a genuinely disputedly issue of fact as to whether he appreciated the nature and consequences of shooting himself in the head. Thus, she argues, he could not have committed suicide under Wood so his death must have been accidental under Fryman. For many reasons, this argument is simply unacceptable.
 
 
 27
 Primarily, the court in Fryman mandated a common sense reading of 'accidental death.' That case involved an insurance company's challenge to the payment of accidental death benefits where the insured became intoxicated and died in an accident while speeding on his motorcycle. The company argued that the decedent's conduct amounted to reckless endangerment and the result could not have been accidental since it was foreseeable. The court held that regardless whether decedent had been drunk and speeding, a motorcycle accident is still something commonly regarded as an 'accident,' and absent a showing that the death resulted from decedent's plan, design or intent, the policy's coverage would be enforced. Fryman, 704 S.W.2d at 206.
 
 
 28
 The Fryman case is clearly distinguishable from the case at bar. Smith offered no factual theory (such as misfiring or horseplay) allowing for the jury to conclude that Mathis placed the gun at his temple and fired by accident. Kirkpatrick was the only eyewitness and he testified that Mathis' act was deliberate. Mathis had only moments earlier observed what a bullet did to his floor and expressed his displeasure over the gun's destructive force. He then reloaded the pistol and, in front of Kirkpatrick, shot himself in the head. Unlike the death in Fryman, this is not what people commonly understand to be an accident.
 
 
 29
 Furthermore, we do not think that there is any basis for Smith's attempt to merge the accident standard with the insanity exception to the suicide exclusion. As shown by Prudential Ins. Co. v. Redwine, 332 S.W.2d 643 (Ky. 1959), the beneficiary must come forward with some plausible theory of accidental death to carry her burden where suicide is suspected. The district court was correct in concluding that Mathis' mental state was not relevant since that goes to the issue of 'suicide' and not to the issue of 'accident.'
 
 
 30
 Finally, even if this court considers Mathis' mental state as relevant to the issue of accidental death, we note that no Kentucky case has held that the insanity exception to the contractual suicide exclusion applies where the state of mind is hampered by voluntary intoxication. Indeed, it is a general principle of law and common sense that one who intentionally or negligently becomes intoxicated is thereafter held to the same standard of conduct as if he were sober. Prosser & Keeton, The Law on Torts Sec. 32 (5th ed. 1984). We do not think it prudent for this court to extend Kentucky's common law in derogation of this general rule.
 
 
 31
 The judgment of the district court is AFFIRMED.