**Henry LOGAN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C 87–0123–L(B).**

United States District Court, W.D. Kentucky, Louisville Division.

May 17, 1990.

---

Norman E. McNally, Louisville, Ky., for plaintiff.

Richard Dennis, Asst. U.S. Atty. and David Busse, Veterans Admin., Louisville, Ky., for defendant.

## MEMORANDUM

BALLANTINE, District Judge.

Plaintiff, an Army veteran, commenced this Federal Tort Claims action, Title 28 U.S.C. § 2671 *et seq.*, against the Veterans Administration Medical Center (VAMC) in Louisville, alleging medical malpractice, unnecessary and improper surgery, and lack of informed consent to the surgery. The matter was tried on November 29, 1989, and is before the Court or findings of fact, conclusions of law and judgment. F.R. Civ.P. 52.

It is conceded that plaintiff has exhausted his administrative remedies, Title 28 U.S.C. § 2675(a), and, therefore, the Court has jurisdiction of the subject matter and of the parties. Title 28 U.S.C. § 1346(b).

A preliminary matter needs to be addressed.

Following the trial, counsel for defendant requested that post-trial briefs and memoranda be delayed until the transcript of evidence had been filed. The transcript was filed February 9, 1990, and the parties were ordered to submit simultaneous memoranda. After extensions were granted, defendant filed its memorandum on April 6, 1990, but, as of the date of this memorandum, plaintiff has not filed any post-trial brief. The Court will therefore prepare its findings without guidance from plaintiff.

The following recitation of plaintiff's history is taken from United States' Exhibit 2 at trial, plaintiff's medical record at VAMC, and references to "MR ____" indicates the page at which the procedure is described.

Plaintiff has a lengthy history of foot problems dating back to 1966. Those prob-

lems were finally diagnosed as intractable plantar keratosis (IPK). When conservative treatment by the Podiatry Clinic at VAMC, consisting of shaving, the application of acid, and corrective shoes and appliances, failed to accomplish any permanent relief, on January 20, 1983, plaintiff was referred to the Orthopedic Clinic for surgery (MR 10).

On February 15, 1983, plaintiff underwent a surgical procedure described as resection of the left third metatarsal head (MR 11). On April 26, 1983, plaintiff underwent the same procedure on his right foot (MR 18).

On June 2, 1983, plaintiff was diagnosed as having "hammer toe" on his left foot, and on July 13, 1983, he underwent an arthrodesis of the second toe of his left foot (MR 23).

When plaintiff's complaints of pain persisted, he returned to VAMC and on March 14, 1984, the second and third toes on the left foot were removed (MR 26).

On August 28, 1984, plaintiff underwent yet another surgical procedure following a diagnosis of a neuroma at the site of the March 14, 1984, surgery and a hammer toe on the right foot (MR 31). The neuroma was removed and the hammer toe was fused at the proximal interphalangeal joint (MR 31).

Plaintiff's foot problems persisted and on August 9, 1985, another neuroma and a plantar wart were removed from his left foot (MR 44).

At the outset, it must be noted that Kentucky law applies to this controversy. Title 28 U.S.C. § 1346(b). See *Hess v. United States*, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960), and *Welsh v. United States*, 844 F.2d 1239 (6th Cir.1988).

In Kentucky, "[N]egligence in medical malpractice cases must be established by expert testimony unless negligence and injurious results are so apparent that a layman with general knowledge would have no difficulty in recognizing it." *Morris v. Hoffman*, 551 S.W.2d 8, 9 (Ky.App.1977).

■ The Court has no difficulty in holding that the circumstances of this case require the introduction of expert testimony and we therefore will not analyze the plaintiff's testimony as it relates to his claim of malpractice and his claim that the surgical procedure departed from the standard of care in such cases. Also before beginning our discussion it should be clear that plaintiff is making no claim for his problems with his right foot (Plf's depo. p. 50–52).

■ At trial plaintiff introduced the deposition testimony of Dr. Louis Heusmann, a Board-certified orthopedic surgeon who practices in Delaware, Ohio.

Neither Dr. Heusmann nor plaintiff suggests that the surgical procedures were negligently performed. The thrust of plaintiff's complaint is that the surgery was an inappropriate method of treating plaintiff's condition.

Dr. Heusmann's deposition is difficult to summarize owing in part to the repeated colloquies between counsel. When asked what procedures he considered would be a violation of the standard of care in plaintiff's surgery, Dr. Heusmann responded: "A resection of met[atarsal] head or plantar wart." (Depo. p. 43–44). Dr. Heusmann was then asked:

"Q. You don't consider that there was intractable plantar keratosis here?

A. There might have been, but I don't think that is synonymous with verruca plantars or plantar wart.

Q. If there had been IPK here, would the resection of the metatarsal head have been a violation of the standard of care?

MR. MCNALLY: For treatment of what condition?

A. He is saying, if I understand your question right, if the patient, hypothetically, if the patient had had IPK.

Q. Yes.

A. Would resection on the met head be a standard of—deviation of the standard of care.

Q. That's correct.

A. And I said no.

Q. Why do you not believe that IPK was present here?

A. I didn't say that.

Q. All right. Let me rephrase that. Doesn't the medical record indicate that IPK was present?

A. Yeah.

Q. And wasn't there a resection of the metatarsal head done for the condition of IPK?

MR. MCNALLY: On the left foot?

A. I would have to go back and refresh my memory. I am talking about the initial operation.

It was my understanding that the initial operation was done, resection of the met head, for intractable verruca plantars or plantar wart. And I believe that first operation of the left foot was 8–27–81.

Q. That wouldn't have been '81.

A. That's when he was first seen, sorry.

MR. MCNALLY: 2–14–83. Somewhere around there.

A. 2–14 or 2–15 of '83. That's correct. I am sorry. That's the right third. I am looking for the left third. Left third metatarsal head resection. Okay.

\*　　\*　　\*　　\*　　\*　　\*

Q. And it is your opinion based upon your review in this case that there was at the time of the first surgery in 1983 verruca plantars or plantar's warts but not IPK?

A. Yeah, well, the admitting note on 2–14–83 says patient has been treated with multiple methods, nitrogen, acid, metatarsal block and shaving.

Now, in my teaching and training and knowledge, you don't use nitrogen and—well, you usually don't use acid in the context here of acid on IPK.

You might use a metatarsal block or shaving, but I don't know that you use—this is treatment directed at plantar wart that he is describing here.

Q. Is it probable, doctor, that he was being treated for both IPK and plantar's warts?

A. It could be, yes."

(Deposition, pp. 44–46, 48–49.)

Dr. Heusmann did not challenge the resection of the metatarsal head as the appropriate treatment for IPK. Rather, he assumed that the surgery was for treatment of plantar warts.

A review of the medical records discloses that as early as September 3, 1981, plaintiff was diagnosed by the VAMC Podiatry Clinic as having traumatic IPK (MR 3), and that that diagnosis was repeated on January 7, 1982 (MR 6), March 4, 1982 (MR 7), April 29, 1982 (MR 7), July 8, 1982 (MR 8), and September 2, 1982 (MR 9). Finally, on January 20, 1983, the record reports that plaintiff was referred to the orthopedic surgeon, Dr. O. James Hurt "for consideration metatarsal head section 3rd lt. foot" (MR 10).

Dr. Chester Nava, the podiatrist who made the entries in plaintiff's record relating to IPK, testified that after he had unsuccessfully tried conservative treatment of plaintiff's IPK, he consulted with Dr. Hurt and plaintiff, and it was agreed that surgery was the only viable option (Transcript of Evidence, p. 60 *et seq.*)

Dr. Hurt is a Board-certified surgeon who was the Chief of the orthopedic clinic at VAMC until his retirement in 1986 (T.E. 135). He first saw plaintiff on January 20, 1983 (T.E. 129), and at the time of the first surgery, there was a diagnosis of IPK (T.E. 133).

Dr. Hurt also testified that prior to the surgery, he was familiar with the prior treatment plaintiff had received from Dr. Nava and that he knew of no conservative measure that should have been taken that was not. (T.E. 137–138).

Dr. Hurt testified from the medical records that the first diagnosis of a hammer toe on the left foot was made June 2, 1983 (T.E. 148). Plaintiff was seen again on June 27, 1983, and was put on the waiting list for surgery. (T.E. 150). On July 13, 1983, plaintiff underwent surgery for repair of a hammer toe (T.E. 152).

In March, 1984, plaintiff underwent another surgical procedure described as, "a disarticulation of the second and third metatarsal phalangeal joints of the left foot." In plain English, his second and third toes were amputated. (T.E. 153). Dr. Hurt

was of the opinion that the amputation was the only remedy that would relieve plaintiff's intractable pain in his foot (T.E. 154).

The Court has set forth Dr. Hurt's testimony in some detail because it is felt that, as the treating physician, his testimony is entitled to greater weight than that of Dr. Heusmann. This conclusion is strengthened by the fact that Dr. Heusmann's opinion that the treatment was a departure from standard practice was premised on his belief that plaintiff's main complaint was plantar warts. The medical record establishes that the condition which the metatarsal head resection was intended to relieve was IPK, not plantar warts.

All of the credible evidence before the Court convinces the Court that there was no departure from the standard of care in treating plaintiff's IPK. Dr. Heusmann's opinion to the contrary is based on his misunderstanding of the condition for which the surgery was performed.

■ We turn next to the claim of lack of informed consent.

Prior to each surgical procedure, plaintiff executed either a form styled, "Request for administration of anesthesia and for performance of operation and other procedures" (MR 12, 19, 24, 28), or a form styled, "Patient Consent." (MR 37–38, 45–46).

Each of the first four forms contained a handwritten description of the surgery to be performed. Those descriptions are in everyday English: "Make incision—find tip of bone and saw it off and remove it" (MR 12), "remove bone from foot" (MR 19), "operation to allow straightening of second toe on left foot" (MR 24), and "removal of 2nd and 3rd toes left foot." (MR 28).

The patient consent forms likewise contain descriptions which are readily understandable by a layman: "to fuse middle joint of R 2nd toe to explore L foot to remove nerve ending," (MR 37), and "to remove neuroma and shave the callus from left foot." (MR 45).

At trial, plaintiff testified that Dr. Hurt did not explain the complications that could arise from the surgery, including infection,

death, or changes in the way he would walk, and that had such information been given to him, he would not have consented (T.E. 15–16). This testimony is refuted by the testimony of Dr. Nava (T.E. 66–68, 84, 85–87, 98–100, 108–109), and Dr. Hurt (T.E. 155, 161–164, 167–169, 181–183, 185–186).

The forms which plaintiff signed but which he denies reading (T.E. 41–42) provide that the patient had no guarantees made concerning the results and that the risks and expected results had been explained.

The standard for determining whether a patient's consent is informed is set forth in KRS 304.40–320 (1976):

"In any action brought for treating, examining, or operating on a claimant wherein the claimant's informed consent is an element, the claimant's informed consent shall be deemed to have been given where:

(1) The action of the health care provider in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with the accepted standard of medical or dental practice among members of the profession with similar training and experience; and

(2) A reasonable individual, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and substantial risks and hazards inherent in the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures.

\* \* \* "

In *Holton v. Pfingst*, 534 S.W.2d 786 (Ky.1975), decided before the enactment of the statute just quoted, the Court articulated the standard by which the extent of disclosure is to be judged:

"If it is the law, and it surely is, that a physician ordinarily is not liable for an honest mistake in judgment, when he follows acceptable medical standards for examination and diagnosis and treat-

ment, then the extent of disclosure relevant to securing the patient's consent must be evaluated in terms of what the physician knew or should have known at he time he recommended the treatment to the patient."

534 S.W.2d at 789.

Even plaintiff's expert, Dr. Heusmann, conceded that in his practice he didn't list each and every conceivable complication attendant on surgical procedure. (Depo. 52).

The Court rejects plaintiff's testimony that he would have refused the surgery had he known of the *risk*. While he might have refused the surgery had he known of the ultimate *results*, no results were guaranteed, and results do not equate with risks.

It is hornbook law that, in the absence of a contract to cure a patient or to accomplish a result, a physician does not warrant or insure either a correct diagnosis or a successful course of treatment. Prosser and Keaton on Torts, 5th Ed. (1984), § 32 at page 186.[1] This statement has been cited with approval by the Court of Appeals of Kentucky, then Kentucky's highest court, in *Hackworth v. Hart*, 474 S.W.2d 377 (Ky.1971).

The Court finds that plaintiff's consent was informed in that defendant's agents' disclosure to plaintiff was based on what they knew or reasonably expected the result would be. That they may have been wrong is no more than an honest mistake in judgment for which they are not liable. *Holton v. Pfingst, supra.*

### CONCLUSION

While it is regrettable that plaintiff's longstanding foot problems, no doubt exacerbated by his tour of duty in Viet Nam, cannot be cured by any medical or surgical treatment, the Court finds that there is no credible evidence of negligence. The Court further finds that the treatment given plaintiff did not fall "below the degree of care and skill expected of a reasonably competent practitioner." *Reams v. Stutler,* 642 S.W.2d 586, 588 (Ky.1982).

Finally, the Court finds from a preponderance of the evidence that defendant's agents explained in sufficient detail the risks and expected results of each procedure so as to render plaintiff's consent to the procedure informed.

Judgment will be entered for defendant.

An appropriate order has been entered this 17th day of May, 1990.

success] and, I understand, never made any claim that you did." (T.E. 182).

---

1. The authors note that a doctor seldom contracts to cure a patient, and counsel for plaintiff conceded that "no physician does [guarantee